IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.

GARY L. GILLOM (01),

        Defendant.

Case No. 16-cr-40059-01-DDC

**MEMORANDUM AND ORDER**

Defendant Gary L. Gillom has filed a Motion to Suppress Evidence (Doc. 27). The government responded to Mr. Gillom's motion (Doc. 28). Mr. Gillom submitted a Supplement to his motion (Doc. 36), and the government submitted a response to the Supplement (Doc. 43). The court conducted an evidentiary hearing on February 6, 2017. At the end of that hearing, Mr. Gillom asked for leave to submit additional briefing to address issues identified during the hearing. The court established a schedule and Mr. Gillom submitted a Post-Hearing Brief on Motion to Suppress (Doc. 50). The government filed a Response to Mr. Gillom's Post-Hearing Brief (Doc. 51). After carefully considering the evidence and the parties' submissions, the court denies Mr. Gillom's motion.

**I.    Factual Background**

On July 11, 2016, law enforcement officers executed an arrest warrant for Mr. Gillom at a residence in Kansas City, Kansas. Before executing the warrant, officers surveilled the residence. Officers observed a woman leaving the house, and she left the area in a car she was driving. Two officers stopped the car about 10 blocks from the residence. The officers told the woman that they had stopped her for a safety belt violation and because the tags did not match

the car. The officers questioned the woman, and she identified herself as Lashandra Darden. The officers eventually asked the woman to step out of the car. In response to additional questions, Ms. Darden confirmed that she owns the residence that officers were watching and that Mr. Gillom is her brother. Ms. Darden told officers that Mr. Gillom was inside the residence, along with her three daughters, ages 14, 9, and 8.

Ms. Darden was traveling with a friend, Trey, an African American male. Trey was riding in the front passenger seat of the car when the officers stopped Ms. Darden. Ms. Darden testified that, initially, she was worried during the traffic stop because of recent police shootings of African American males. Ms. Darden said that she had talked to her children about how to interact with the police. She has told them to stay calm and comply with officers' requests because she wants her kids to stay safe and come home.

Despite her worries, Ms. Darden described her conversation with the officers as a pleasant one. She testified that the officers were not rude or aggressive. They did not threaten her, mistreat her, or use violence in any way. The officers did not promise Ms. Darden anything or lie to her. The officers told Ms. Darden that they were not going to give her a ticket for the traffic violations. And, they ended the traffic stop by giving Ms. Darden a verbal warning. Also, the officers told Ms. Darden's passenger that they would help him after he expressed concerns that the traffic stop may cause him to miss a court date. Specifically, the officers told Ms. Darden that they would contact the court to explain why Trey did not appear for court and make sure he did not get into trouble for missing his court date.

During the traffic stop, one of the officers asked Ms. Darden if she would provide a key to her house so that officers could enter the home to arrest Mr. Gillom. Ms. Darden agreed to give the officers her house key because she did not want law enforcement kicking in her door or

2

breaking windows to gain entry to the home. Ms. Darden also told the officers that she was worried about her children because they were in the house. And, she told the officers that she wanted to go to the house right then. The officers told Ms. Darden that she couldn't go to the house until after officers had arrested Mr. Gillom.

After Ms. Darden provided her house key, officers drove it over to Ms. Darden's residence. Using the key, officers entered the home and arrested Mr. Gillom. Ms. Darden returned to her home after the arrest. When she arrived, she saw Mr. Gillom sitting outside of the house. And then, she saw officers escort Mr. Gillom into a vehicle and drive him away. Ms. Darden also saw her daughters outside the home. Her daughters were wearing pajamas and no shoes.

Ms. Darden estimates that about 15 officers were around the house, both inside and outside the residence. As Ms. Darden stood outside her home, two Deputy United States Marshals approached her and spoke with her about providing consent to search the residence. One of them was Deputy United States Marshal Chris Johnson. Deputy Johnson explained that the officers wanted to check the residence for some evidentiary items. He also told Ms. Darden that she and her family could not enter the home until the search was completed. Deputy Johnson explained to Ms. Darden that she had two options. The first option was for Ms. Darden to consent to the search of her home. Her consent would allow the officers immediate access to the home to complete their search, and Ms. Darden and her family could reenter their home when the search ended. The second option would require the officers to seek a warrant from a judge. The officers told Ms. Darden that the search warrant process could take anywhere from an hour until the end of the day. And, during that process, the officers would not allow Ms. Darden, her family, or anyone else to go into the home. It is, the officers testified, standard law enforcement

procedure for officers to prohibit entry into a residence that officers intend to search so that evidence remains preserved.

Ms. Darden testified that she asked the officers what they were searching for, and they told her that they were looking for a weapon. Ms. Darden told them that she had no weapons in her home, and she gave permission to the officers to search the residence. Deputy Johnson presented Ms. Darden with a form giving the officers consent to search. Ms. Darden signed the form. It provided:

> These deputies are authorized by me to take from my premises any letters, papers, materials, or other property which they may desire.
>
> This written permission is given by me to the above-named person(s) voluntarily and without threats or promises of any kind.

Doc. 36-2 at 1. Ms. Darden testified that she never read the language on the form before signing it. But Deputy Johnson testified that it appeared to him that Ms. Darden read the form before signing it.

Ms. Darden also testified that the officers never threatened her when she signed the form. Instead, the officers told Ms. Darden that they intended to get a warrant, that obtaining the warrant could take some time, and that they could not let her back into the home until they had searched the house. Ms. Darden described the conversation with the officers as pleasant. She said that the officers were not aggressive during their conversation. But, Ms. Darden was mad that the officers would not let her into the house because one of her daughters needed to use the restroom. After Ms. Darden signed the form, the officers let her escort her daughter into the house to visit the restroom.

Deputy Johnson testified that Ms. Darden was cordial and cooperative, and she did not seem afraid during their conversation. He thought that Ms. Darden seemed more concerned

4

about her friend Trey missing his court date. Deputy Johnson gave his business card to Trey. He instructed Trey to give it to his attorney and to tell his attorney to call him if Trey had any issues with missing the court date. Indeed, Deputy Johnson received a call from Trey a few days later. Deputy Johnson told Trey that he had contacted the court to explain why Trey had missed the court date. Deputy Johnson also testified that he was not required to contact the court for Trey. But, he did so because he wanted to help Trey after he and Ms. Darden had cooperated with the officers.

After Ms. Darden signed the consent form, the officers searched her home for about 15 to 20 minutes. The officers never found a weapon in the home. And, according to Ms. Darden, none of the officers told her that they were looking for items in the home other than a weapon. But, Deputy Johnson testified that he also had told Ms. Darden that the officers were looking for other items. Deputy Johnson spoke with Detective Victor Riggin of the Topeka Police Department after Mr. Gillom's arrest. Detective Riggin was investigating Mr. Gillom's suspected involvement with an aggravated robbery in Topeka, Kansas. Detective Riggin told Deputy Johnson that law enforcement was looking for a weapon, a cell phone, and a Darth Vader hooded sweatshirt that one of the suspects had worn during a recent robbery. So, officers searched for those items during their search of Ms. Darden's residence. And, Deputy Johnson testified that he explained this to Ms. Darden. He also acknowledged that the consent form signed by Ms. Darden did not limit the officers' search to weapons.

During the officers' search of the residence, Deputy Johnson found a cell phone on the window sill of the first bedroom that he entered in the house. This room also contained Mr. Gillom's clothes and other personal items. The officers asked Ms. Darden if the cell phone was Mr. Gillom's phone. Ms. Darden said that she did not know because she did not know what Mr.

5

Gillom's phone looked like. Neither Ms. Darden nor any of her family members identified the phone as one belonging to any of them. And, so, through questioning of the family members, the officers determined that the phone probably belonged to Mr. Gillom.

Officers seized the phone, but did not search its contents. Officers delivered custody of the phone to the Topeka Police Department. On July 12, 2016, a Shawnee County, Kansas state court judge issued a search warrant for the cell phone that Deputy Johnson had found inside Ms. Darden's residence.

Mr. Gillom testified at the February 6, 2017 hearing that he does not live with Ms. Darden. He lives with his mother at another residence in Kansas City, Kansas. But, Mr. Gillom had stayed as a guest in Ms. Darden's home for about two weeks leading up to his July 11, 2016 arrest. When Mr. Gillom had stayed with Ms. Darden in the past, he slept in the living room. He also kept personal items such as clothing and toiletries in a closet in Ms. Darden's son's room.

Ms. Darden agreed that she had allowed Mr. Gillom to stay at her home in the past whenever he wished. But, on July 10, 2016, Ms. Darden specifically told Mr. Gillom that he could no longer stay at her home. On the evening of July 10, Mr. Gillom came to Ms. Darden's home, and he told her that he had an outstanding warrant. Because Ms. Darden was on probation at the time, she knew that she could not allow someone with an outstanding warrant stay in her home. So, Ms. Darden told her brother that he could not stay at her house.

After learning that he couldn't stay with his sister, Mr. Gillom called a cab and left his sister's home. He came back to her house about 1:00 a.m., though, because he had nowhere else to go. Mr. Gillom tried calling his sister's phone, but she did not answer. He also tried the front door, but it was locked and no one answered. Ms. Darden's van was parked in the driveway.

6

Mr. Gillom knew that his sister kept the van unlocked. So, he got into the van and stayed there until sunrise.

Ms. Darden saw Mr. Gillom in the back of her van when she left the house on the morning of July 11. She told Mr. Gillom—again—that he could not stay at her home because of the outstanding warrant. A few minutes later, Mr. Gillom called Ms. Darden and asked if he could get into the house to shower and use the restroom. Ms. Darden told him that was okay and instructed him to ask her children to let him in the house. Ms. Darden gave Mr. Gillom permission to go into the house to shower, charge his phone, and find a ride. Mr. Gillom went inside the house and fell asleep in the living room. He woke up to officers executing the search warrant, and he was arrested.

**II.     Analysis**

Mr. Gillom moves to suppress the evidence derived from the cell phone that officers located and seized during the search of his sister's residence because, he contends, the search and seizure violated his rights under the Fourth Amendment. Mr. Gillom asserts, first, that he had a legitimate expectation of privacy in his sister's home, thus giving him standing to assert his Fourth Amendment challenge. Mr. Gillom next argues that the government violated his rights because his sister's consent to search the home was involuntary and coerced. Finally, Mr. Gillom asserts that the officers had no legal basis to seize the cell phone found during the search. For these reasons, Mr. Gillom contends that the government's seizure of the cell phone violated the Fourth Amendment. And, as a consequence, Mr. Gillom argues that the cell phone and its contents are inadmissible. The court addresses each argument, in turn, below.

### A. Does Mr. Gillom Have Standing to Object to the Search of his Sister's Home?

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, a search is per se unreasonable unless law enforcement secures a warrant based on probable cause. *See id.*; *Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions." (citation and internal quotation marks omitted)).

The Fourth Amendment establishes "a personal right that must be invoked by an individual." *United States v. Poe*, 556 F.3d 1113, 1121 (10th Cir. 2009) (first quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); then citing *United States v. Rubio-Rivera*, 917 F.2d 1271, 1274 (10th Cir. 1990)). Thus, "a defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search." *Id.* (citation omitted). "Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'" *Id.* (quoting *United States v. Rhiger*, 315 F.3d 1283, 1285 (10th Cir. 2003)).

It is well-established that a defendant has a reasonable expectation of privacy in his own home. *United States v. Maestas*, 639 F.3d 1032, 1035 (10th Cir. 2011) (citing *Griffin v. Wisconsin*, 483 U.S. 868, 884 (1987)). In certain circumstances, a defendant also "may have a legitimate expectation of privacy in the house of someone else." *Minnesota v. Carter*, 525 U.S. 83, 89 (1998). For example, in *Minnesota v. Olson*, 495 U.S. 91 (1990), the Supreme Court held that a defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Id.* at

8

96–97. The Tenth Circuit also has held that "a social guest who does not stay overnight has a reasonable expectation of privacy" in the host's property. *Poe*, 556 F.3d at 1122 (citing *Rhiger*, 315 F.3d at 1286). To qualify as a social guest subject to invoke the protections of the Fourth Amendment, a defendant must have a "degree of acceptance into the household," *Rhiger*, 315 F.3d at 1286 (quoting *Carter*, 525 U.S. at 90), or an "ongoing and meaningful connection to [the host's] home," *id.* at 1287.

Here, Mr. Gillom asserts that he has standing to assert a Fourth Amendment challenge because he was an overnight guest at his sister's home. The evidence establishes, though, that Ms. Darden had revoked her permission for Mr. Gillom to stay at the home overnight. On the evening before his arrest, Ms. Darden told Mr. Gillom that he no longer could stay at her home because he had an outstanding arrest warrant. The following morning, Ms. Darden again told Mr. Gillom that he could not stay at her home. Under these facts, the court is reluctant to conclude that Mr. Gillom had a "degree of acceptance into the household" sufficient to establish standing as a social guest there. *Id.* at 1286.

But, the court also recognizes that Mr. Gillom had stayed as an overnight guest at his sister's home in the weeks leading up to his arrest. He had slept in the living room, and he kept some personal belongings in one of the bedrooms. These facts tend to show that Mr. Gillom had "an ongoing and meaningful connection" to his sister's home to establish his status as a social guest. *Id.* at 1287. And, on the morning of his arrest, Ms. Darden gave Mr. Gillom permission to enter her home for the limited purpose of showering, charging his phone, and finding a ride. Although Ms. Darden had revoked Mr. Gillom's eligibility to stay in her home overnight, these other facts tend to show that Mr. Gillom, on the morning of his arrest, at least enjoyed a "degree of acceptance into the household," even if that acceptance was confined to certain activities. *Id.*

9

The court thus will assume, without deciding, that Mr. Gillom has established his status as a social guest sufficient to challenge the search of his sister's home.

### B. Mr. Gillom's Sister Provided Lawful Consent to Search the Home.

Even if Mr. Gillom has standing to challenge the search, he cannot establish a Fourth Amendment violation because his sister gave lawful and valid consent to search her home. Although a guest may have a legitimate expectation of privacy in the home of his host, the guest still "ha[s] no legal interest in the premises and do[es] not have the legal authority to determine who may or may not enter the household." *Olson*, 495 U.S. at 99. Instead, the host retains "ultimate control of the house." *Id.* And, "[t]he host may admit or exclude from the house as [s]he prefers." *Id.*; *see also United States v. Ruiz*, 664 F.3d 833, 839 (10th Cir. 2012) (explaining that "even if we assume that [defendant] had an expectation of privacy in [an airplane] hangar akin to that of a houseguest, [the owner of the hangar] could nevertheless admit law enforcement officials into the hangar").

It thus is well settled that one of the exceptions to the Fourth Amendment's warrant requirement is that law enforcement may search a home when its owner consents to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). *See also id.* at 221 (stating that "a search authorized by consent is wholly valid"); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (explaining that "[t]he prohibition [against warrantless searches] does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises").

Here, Ms. Darden, the owner of the residence and Mr. Gillom's host, had every authority to consent to search of her home. Ms. Darden gave officers her express consent to search in two ways. She gave verbal permission to the officers to search the residence. She also signed the

consent form authorizing officers to search the house for "any letters, papers, materials, or other property which they may desire." Doc. 36-2 at 1. Thus, the officers committed no Fourth Amendment violation when they searched the home after the owner consented.

But, Mr. Gillom asserts that the search violated the Fourth Amendment because his sister's consent was coerced and involuntary. Consent is only valid if it is "freely and voluntarily given." *Schneckloth*, 412 U.S. at 222 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). The government bears the burden "of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983).

A court determines the validity of a consent-based search by examining the totality of the circumstances and deciding "whether the consent was the product of an essentially free and unconstrained choice by the maker or whether it was the product of duress or coercion, express or implied." *Eidson v. Owens*, 515 F.3d 1139, 1146 (10th Cir. 2008) (quoting *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006)). The relevant factors "include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons." *Id.* (quoting *Sawyer*, 441 F.3d at 895).

Mr. Gillom gives several reasons that, he contends, Ms. Darden's consent was involuntary and coerced. The court considers each of his arguments below. But, after examining each in the totality of the circumstances, the evidence does not establish that Ms. Darden's consent was produced by duress or coercion to invalidate it under the Fourth Amendment.

*First*, Mr. Gillom asserts that Ms. Darden's consent was coerced because officers threatened her with a warrant. An officer's statement that he would seek a search warrant if

11

consent is refused is not per se coercive. *United States v. Cruz-Mendez*, 467 F.3d 1260, 1267 (10th Cir. 2006). But, a threat to obtain a warrant may invalidate consent if the officers lacked the probable cause necessary for a search warrant. *Eidson*, 515 F.3d at 1146 (citing *Cruz-Mendez*, 467 F.3d at 1268). "Probable cause for a search warrant requires 'facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *United States v. Basham*, 268 F.3d 1199, 1203 (10th Cir. 2001)). Mr. Gillom asserts that the officers lacked the requisite probable cause to secure a warrant because the only evidence supporting probable cause was that Mr. Gillom was arrested in the home. But Deputy Johnson testified that this was not the only evidence that officers would have presented to a judge if required to apply for a warrant. He explained his plan to secure a warrant had Ms. Darden elected not to consent. He explained he planned to work with the investigating agency and detectives to formulate all of the information associated with the case to secure the warrant. The government did not delineate, specifically, all of the facts that it would have relied on to apply for a warrant—which the court understands. After all, Ms. Darden gave unlimited, explicit consent to search the house. But, even on this limited record, officers had probable cause to secure a search warrant of Ms. Darden's home.

Indeed, law enforcement had secured an arrest warrant from a judge in Shawnee County, Kansas who determined that probable cause existed to arrest Mr. Gillom for committing an aggravated robbery while armed with a gun. Deputy Johnson testified that law enforcement started surveilling Ms. Darden's residence after they learned that Mr. Gillom might be located there. Law enforcement confirmed that Mr. Gillom was inside the house, and officers later arrested him inside the house. Also, law enforcement had reason to believe that Mr. Gillom possessed a weapon. And, law enforcement was searching for that weapon and the clothing that

one of the suspects had worn during a recent aggravated robbery.  Ms. Darden's house was likely to contain this evidence since Mr. Gillom had stayed there in the weeks leading to his arrest and he was present in the home when he was arrested.  *See*, *e.g.*, *United States v. Wittgenstein*, 163 F.3d 1164, 1172 (10th Cir. 1998) (holding that probable cause supported a warrant to search a residence when officers located defendant in the same city as the residence, observed defendant's vehicle parked at the residence, and the defendant had listed the house as her address); *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir.1986) (holding that probable cause existed to search a house for a gun defendant had been seen with 10 days earlier); *United States v. Gaines*, 127 F.3d 1109, 1997 WL 657022, at *2 (10th Cir. Oct. 22, 1997) (unpublished table opinion) (concluding that probable cause existed to support the search of a residence because it was reasonable to believe that defendant possessed a weapon and "[f]irearms and ammunition are reasonably expected to be kept at an individual's home or on their person for an extended period of time"); *United States v. Landers*, No. 00-40093-01-RDR, 2001 WL 83278, at *3 (D. Kan. Jan. 10, 2001) (holding that probable cause existed to support a search warrant of a residence because it was likely that it contained evidence of an armed robbery).  The court thus concludes that probable cause existed to support a search warrant for Ms. Darden's home.

      But, even if the officers' statements to Ms. Darden about securing a warrant if required to had produced some level of coercion, this is just one of the factors that the court must consider under the totality of the circumstances test.  *See Cruz-Mendez*, 467 F.3d at 1267 (explaining that statements about obtaining a warrant are not per se coercive and courts "must still examine the particulars of the case").  The other factors show that Ms. Darden's consent to search was given freely and voluntarily.  No evidence exists that either Deputy Johnson or any of the other officers on the scene raised their voices or used an aggressive tone with Ms. Darden.  Officers never

13

showed any force, never displayed a weapon, and never mistreated or threatened Ms. Darden. Ms. Darden was not physically restrained. And, the officers never deceived Ms. Darden, never engaged in any trickery, and never displayed any other sign of force or coercion so that Ms. Darden would consent to the search.

*Second*, Mr. Gillom asserts that Ms. Darden's consent was coerced because she is uncomfortable around the police, especially after recent police shootings of unarmed African American males. While Ms. Darden may have developed this concern after other incidents in different parts of the county, her interactions with the police officers both at the traffic stop and at her residence belie her concerns. The officers were not rude to her. They also were not aggressive or hostile. They never displayed their weapons or used any force. To the contrary, Ms. Darden described her conversations with the officers as pleasant. She also conceded that the officers had offered to help her friend, an African American male, by contacting the court to explain why he had missed his court date. Under these facts, the court cannot find that the officers coerced Ms. Darden's consent.

*Third*, Mr. Gillom asserts that officers coerced Ms. Darden's consent because they would not allow her into the home even though her daughters were outside the house wearing only their pajama and no shoes, and one needed to use the restroom. These facts certainly show that the officers' actions inconvenienced Ms. Darden, but they do not establish duress or coercion under the relevant factors. Again, the officers never mistreated or used violence against Ms. Darden. The officers also did not engage in deception or trickery. The record also confirms it is standard law enforcement procedure to prohibit access to a place that officers intend to search because of the need to protect evidence. The officers followed that procedure here. And, no evidence shows that officers used this procedure to trick Ms. Darden into providing consent.

14

*Fourth*, Mr. Gillom contends that Ms. Darden limited the officers' search to weapons and thus she never consented to the search and seizure of the cell phone. The evidence fails to support Ms. Darden's purported limitation of the search. Deputy Johnson testified that he told Ms. Darden that the officers were looking for a weapon but he also told her that they were looking for other items—including Mr. Gillom's cell phone and a Darth Vader hooded sweatshirt. Deputy Johnson also provided Ms. Darden with a consent form that gave officers broad authorization to search and seize "any letters, papers, materials, or other property which they may desire." Doc. 36-2 at 1. The form also stated that "[t]his written permission is given by me to the above-named persons voluntarily and without threats or promises of any kind." *Id.* Deputy Johnson testified that Ms. Darden appeared to read the form before signing it, and Ms. Darden signed the form freely and voluntarily.

Mr. Gillom asserts that the scope of the consent form is broader than the scope of any warrant that a judge likely would have issued had officers applied for one. Presumably, that's the reason the officers solicited her consent. But it is no evidence of trickery. The officers never misled Ms. Darden about the contents of the consent form. They provided her the form and gave her an opportunity to read it before she signed it. Ms. Darden could have asked the officers questions about the form, or specifically limited the scope of her consent to a search just for certain items. She did not do so. Instead, Ms. Darden chose, freely and voluntarily, to consent to the search as described in the form.

Also, Ms. Darden never objected to or limited the scope of the search after she signed the form. Ms. Darden was present while officers searched her home, and she knew that they had seized a cell phone. Officers asked Ms. Darden and her family members about the phone, and none of them identified the phone as one belonging to them. Instead, officers determined

15

through questioning that the phone belonged to Mr. Gillom. Ms. Darden's cooperation with officers as they seized the cell phone contradicts any inference that she had limited the search to weapons.

*Finally*, the court recognizes that many officers from different law enforcement agencies were present at Ms. Darden's home. Ms. Darden estimated there were 15 officers. Although a large number of officers on the scene may support a finding of coercion, it is only one of the factors the court must consider. Most of the other factors focus on the officers' words and actions. Ms. Darden concedes that the officers were pleasant during their interactions. They were not aggressive or rude. They did not threaten Ms. Darden. And, the officers agreed to help Ms. Darden's friend by contacting the court to explain why he had missed a court appearance. The majority of the factors thus fail to support a finding of coercion. After considering the totality of the factors, the court concludes that Ms. Darden's consent was the product of free and unrestrained choice. The court thus finds that the officers obtained valid consent from Ms. Darden to search the residence.

### C. Officers Seized the Cell Phone in Plain View.

Last, Mr. Gillom asserts that officers had no lawful basis to seize the cell phone from the residence without first obtaining a warrant. But the undisputed facts require a different conclusion. The officers lawfully seized the cell phone because it was in plain view. *See Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993) (explaining that plain view is one of the exceptions to the warrant requirement). Under the plain view doctrine, law enforcement may seize an object without a warrant if: (1) law enforcement is lawfully in a place from where they viewed the object; (2) the object's incriminating character is immediately apparent; and (3) the

officers have a lawful right of access to the object. *Id.* at 375. All three requirements are satisfied here.

First, the officers lawfully entered Ms. Darden's home after she provided her consent to search it. Second, the object's incriminating character was immediately apparent. Detective Riggin of the Topeka Police Department told Deputy Johnson that officers should search for Mr. Gillom's cell phone because he believed that the phone could contain evidence of Mr. Gillom's alleged involvement in an armed robbery. Deputy Johnson found the cell phone in plain view on a window sill in the first bedroom he entered in the house. The bedroom also contained Mr. Gillom's clothes and other personal items. After questioning Ms. Darden and her family, the officers determined that the cell phone belonged to Mr. Gillom. Thus, the incriminating character of the cell phone was immediately apparent. Finally, the officers had a lawful right of access to the object because Ms. Darden gave officers her broad consent to seize any materials or other property they desired.

Mr. Gillom argues that officers could not rightfully seize the cell phone, even if in plain view, because Ms. Darden lacked authority to consent to a search of his phone. Mr. Gillom cites *United States v. Snype*, 441 F.3d 119 (2d Cir. 2006), to support his argument. But *Snype* differs substantially from the facts here. In *Snype*, the defendant challenged the search of a knapsack and a red bag found in an apartment of a third person who had consented to the search of the residence but, defendant contended, lacked authority to consent to a search of the closed containers seized in the search. *Id.* at 136. *Snype* explains that the resident of a home has "the access and authority necessary to consent to a search of the entire premises" and the "consent would permit the search and seizure of any items found in the apartment with the exception of those 'obviously' belonging to another person." *Id.* In context, the principle applied in *Snype*

17

applies to a search of a closed container, like a bag or a knapsack, belonging an individual who had not consented to the search. That is not what happened here.

Instead, officers seized Mr. Gillom's cell phone after finding it in plain view in a place they lawfully had entered. The officer's mere seizure of the phone "[did] not compromise the interest in preserving the privacy of its contents because [the phone] may only be opened pursuant to a search warrant or one of the well delineated exceptions to the warrant requirement." *Horton v. California*, 496 U.S. 128, 141 n.11 (1990); *see also Riley v. California*, 134 S. Ct. 2473, 2494–95 (2014) (holding that law enforcement must obtain a warrant before searching the contents of a cell phone). The officers recognized as such for they did not search the contents of Mr. Gillom's phone until a Shawnee County, Kansas judge issued a search warrant authorizing a search of the cell phone. Thus, under these facts, law enforcement officers never violated Mr. Gillom's Fourth Amendment rights.

### III.     Conclusion

For the reasons explained above, the court denies Mr. Gillom's motion to suppress.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Gary L. Gillom's Motion to Suppress Evidence (Doc. 27) is denied.

**IT IS SO ORDERED.**

**Dated this 4th day of April, 2017, at Topeka, Kansas.**

                                          **s/ Daniel D. Crabtree**
                                          **Daniel D. Crabtree**
                                          **United States District Judge**